Harold WARREN, Plaintiff

v.

Charles C. COCHRANE,
et al., Defendants

No. CIV.01–293–P–DMC.

United States District Court,
D. Maine.

Dec. 23, 2002.

Fernand A. Martineau, Portland, ME, for Plaintiff.

Roy T. Pierce, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Seth W. Brewster, Verrill & Dana, Portland, ME, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

DAVID M. COHEN, United States Magistrate Judge.

Former Guy Gannett Publishing Company employee Harold Warren filed suit on December 12, 2001, alleging that four named defendants had deprived him of a pension-benefit increase in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.* *See* Complaint (Docket No. 1).

Defendants Charles C. Cochrane, Blethen Maine Newspapers, Inc. Pension Plan and Blethen Maine Newspapers, Inc. (collectively, "Blethen Defendants") filed a motion for summary judgment in their favor, as did defendant Wells Fargo Master Trust & Custody ("Wells Fargo"). *See* Blethen Defendants' Motion for Summary Judgment, etc. (Docket No. 10); Defendant Well [sic] Fargo Bank Minnesota, N.A.'s Motion for Summary Judgment, etc. (Docket No. 13). Wells Fargo's motion was granted, while that of the Blethen Defendants was denied. *See* Recommended Decision on Defendants' Motions for Summary Judgment (Docket No. 22); Order Affirming the Recommended Deci-

sion of the Magistrate Judge (Docket No. 29).

Subsequently the parties consented to have me conduct trial and all other proceedings in this matter, *see* Consent to a Magistrate Judge (Docket No. 34), and a bench trial was held before me as to Warren's ERISA claim against the Blethen Defendants on Monday, December 16, 2002. The parties stipulated to the admissibility of all exhibits offered (Plaintiff's Exhs. 1–12 and Defendants' Exhs. 1–4), and all accordingly were admitted.[2] On the basis of the following findings of fact and conclusions of law, I now rule in Warren's favor.

### I. Findings of Fact

1. Warren, who was born on June 18, 1933, became an employee of the Guy Gannett Publishing Company, later known as Guy Gannett Communications (either, "Gannett"), in 1964. Stipulations (Docket No. 31) ¶¶.1–2.

2. Warren is and was at all relevant times a qualified and vested participant in the Guy Gannett Retirement Plan ("GGRP"), as amended and restated, that became effective on January 1, 1984 ("GGRP84"). *Id.* ¶ 3. His GGRP "participation date," so-called, is July 1, 1967. *Id.* ¶ 4.

3. Warren retired on September 1, 1988 at age 55, after twenty-four years of employment with Gannett. *Id.* ¶ 5. He is a "retired participant" as defined under Article 1, paragraph 1.03(ee) of the GGRP84. *Id.* ¶ 6.[3]

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case, including trial, and to order the entry of judgment.

2. I again commend counsel for the care taken in preparing this case for trial.

3. The GGRP84 defines a "Retired Participant" as "a former Participant who has retired under the Plan and has become eligible

4.  At the time of his retirement, Warren was employed in Gannett's Division 42 and was not a member of the Portland Typographical Union, Local 66, also known as PTU–66. *Id.* ¶ 7.

5.  Warren elected to retire early upon attaining age 55, an election permitted pursuant to the GGRP84. *Id.* ¶ 8. He was given the choice to begin receiving his monthly pension benefit immediately or defer collecting it. *Id.* ¶ 9. He elected the deferred-payment option, which allowed him to receive a higher monthly benefit than he would have received had he chosen the immediate-payment option. *Id.* ¶ 10.

6.  Prior to electing to defer his retirement benefit, Warren was informed that he would receive approximately $250.00 per month if he chose the deferred-payment option. *Id.* ¶ 11.

7.  The GGRP84 provided the Gannett Board of Directors the authority to amend the plan through the following provision:

> 15.01  *Right to Amend*
>
> The Employer reserves the right at any time or times to modify or amend the Plan by resolution of it's [sic] Board of Directors setting forth such modification or amendment; provided, however, that (i) the Board may delegate such authority to the Committee with respect to a modification or amendment which is required to comply with the laws and regulations governing this plan or any modification or amendment which is administrative in nature . . . .

*Id.* ¶ 12.

8.  After Warren's retirement, on September 25, 1990, the Gannett Board of Directors ("Board") voted unanimously to authorize management to improve pension benefits for eligible retired employees under the GGRP84, effective January 1, 1991 ("1991 Increase"). *Id.* ¶ 13.

9.  The official minutes of the September 25, 1990 meeting, recorded by corporate secretary Rachel M. Beaudoin and approved at a subsequent Board meeting, state that John R. DiMatteo (who was then Gannett president) "explained a series of related motions," including one "to improve benefits for both active and retired employees in the Portland Pension Plan, since those benefits have not been improved in seven years and to make the pension plan more attractive for employees considering early retirement." Plaintiff's Exh. 1 at 3–4. It was Beaudoin's practice to include all significant discussion in her minutes.

10.  The minutes reflect that the Board unanimously voted to approve the following resolution ("Resolution"):

> *TO AUTHORIZE MANAGEMENT TO IMPROVE THE GUY GANNETT RETIREMENT PLAN PENSION BENEFITS FOR RETIRED EMPLOYEES (AS OF DECEMBER 31, 1990) EFFECTIVE JANUARY 1, 1991, IN ACCORDANCE WITH THE SCHEDULE DESCRIBED IN THE VOTE IMMEDIATELY PRECEDING.*

*Id.* at 5. The "schedule described in the vote immediately preceding" (pertaining to active employees) provided for a 12 percent increase for those with "participation dates" prior to January 2, 1978. *Id.* at 4.

11.  James Baker, who was employed by Gannett from November 1975 to December 1999 in the capacity of treasurer and vice-president of finance—to wit, chief financial officer—drafted the two Board resolutions providing the 1991 Increase to employees and retirees.

12.  Baker viewed GGRP participants as consisting of three groups: (i) active

to receive benefits under the Plan." Plaintiff's    Exh. 6 at 4.

employees, (ii) those who had left and deferred taking benefits, known internally as either "deferred vesteds" or "terminated vesteds," and (iii) retirees receiving benefits.

13. Gannett historically had increased pension benefits from time to time to counter the effects of inflation. In so doing, prior to the 1991 Increase, it had never categorically excluded any of these three groups from pension-benefit upgrades. However, with respect to the 1991 Increase, Baker and Gannett Vice–President for Human Resources Larry Siegel evaluated the impact of excluding different groups, with technical assistance from Benefits Manager Deborah Mahoney and Gannett's outside benefits-consulting firm, Watson Wyatt & Company ("Watson Wyatt").[4]

14. Ultimately, Baker and Siegel, in consultation with DiMatteo, embraced the idea of excluding the deferred-vested group from participation in the upgrade. According to Baker, exclusion of the deferred-vested group from the 1991 Increase was considered consistent with a conscious decision made by Gannett in 1984 (in the wake of a previous pension-benefit increase) to begin shifting responsibility for protection against inflation from the company to employees. Many in the deferred-vested group had gone onto other jobs and were covered by other retirement plans, as a result of which they were considered able to protect themselves from the effects of inflation.

15. On the afternoon prior to the September 25, 1990 Board meeting, Baker (as was his custom) went over agenda items with the so-called "Executive Compensation" or "Outside Directors" Committee, which consisted of the four to six "outside," or non-Gannett-family members of the Gannett Board.[5] No minutes were kept of such meetings. Baker recalls that he presented management's pension-upgrade proposal, that management's intent to exclude the deferred-vested group was made clear and that those outside directors present agreed with the proposal. Also in attendance were DiMatteo, Gannett Newspapers Division Vice–President John Hooper and possibly Portland Newspapers General Manager Steve Braver.

16. Baker also recalls that, in presenting the Resolution to the Board on September 25, 1990, DiMatteo expressly explained that the deferred-vested group was to be excluded.

17. In the wake of the September 25, 1990 Board meeting Gannett executives issued several memoranda announcing or commenting on the 1991 Increase.

18. In a memorandum dated October 17, 1990, addressed to a distribution list that included Braver, DiMatteo, Baker and Siegel, Hooper stated in part:

As you are aware, it was our plan to improve the GGPC pension plan for *all* retirees *and* actives, effective January 1, 1991. Our tradition has been to make periodic improvements, put them in place at the same time for everyone, and merely inform the Union we were doing so. Current timing has been driven by design and announcement of an early retirement program for Portland, although it's fair to say an improvement has been in the works and would have been announced in 1991 in any case. The last improvement was seven years ago.

---

4. Baker had a close working relationship, on this and other matters, with both Siegel and Mahoney.

5. The Board of Gannett, which was a private corporation, included approximately six members of the Gannett family.

Here's the issue. We may want to reconsider our tradition of providing this upgrade simultaneously for *everyone* currently in the plan. . . .

Plaintiff's Exh. 12 (emphasis in original). Hooper had attended the September 25, 1990 Board meeting, *see* Plaintiff's Exh. 1 at 1, as well as the Outside Directors Committee meeting the day prior.

19. In November 1990 Warren received a memorandum dated November 2, 1990 from Braver to "All Portland Newspapers Employees (except members of PTU–66)," stating among other things:

I have two important items to share with you.

First, the Company will be improving its retirement plan for eligible employees and retirees by as much as 12% effective January 1, 1991. A detailed letter from Mrs. Hawley will follow in the very near future. This increase will be funded out of monies already set aside in our retirement plan fund.

Plaintiff's Exh. 2.[6] Braver was present for the discussion and vote on the 1991 Increase at the September 25, 1990 board meeting, *see* Plaintiff's Exh. 1 at 1, 5, and may have been present at the Outside Directors Committee meeting the day prior.

20. By letter dated November 8, 1990 to "Retirees," Jean Gannett Hawley, publisher and chairman of the Board, wrote:

I am pleased to announce that effective January 1, 1991, benefits under the Guy Gannett Retirement Plan will be increased for retirees. The increase does not apply to retired employees of the Portland Typographical Union in accordance with prior agreement between the Company and PTU, Local 66.

In spite of declining markets locally and nationally, the decision to upgrade benefits has been made consistent with our past practice of increasing benefits from time to time to help counter the effects of inflation.

\*    \*    \*    \*    \*    \*

The benefit increase will be reflected in your January pension check. Plaintiff's Exh. 3. Hawley presided over the September 25, 1990 Board meeting. *See* Plaintiff's Exh. 1 at 1. Warren did not receive this letter in the mail; however, he was given a copy of it by a former co-worker.

21. As of January 1, 1991, the GGRP84 was amended to incorporate the Board-approved benefit increase. Stipulations ¶ 14. The plan, as amended and restated (the "GGRP92"), contained the following provision related to the 1991 Increase:

4.08 1991 RETIREE INCREASE FOR GANNETT PARTICIPANTS

Effective January 1, 1991, the monthly benefit payable to each Retired Gannett Participant who is in pay status as of December 31, 1990, except for an individual whose last employment covered by the Plan was as an Employee of Division 41, shall be increased by the product of:

(a) 1%; and

(b) the lesser of 12, and the number of complete calendar years which elapsed between the date the Retired Gannett Participant first be-

6. Although, from a financial perspective, 1990–91 were the worst years Gannett had ever experienced, the pension-benefit increase was funded entirely from excess monies within the plan. Even had the "deferred vested" group been included, excess monies would have remained (although such monies were used for a variety of purposes, including as a hedge against decreases in market value).

came a Participant and January 1, 1990.

*Id.* ¶ 16.

22.   Watson Wyatt drafted the language of section 4.08.   Both Baker and Mahoney considered it consistent with management's proposal.

23.   The language of section 4.08 of the GGRP requires retirees to have been in pay status to benefit from the 1991 Increase, *id.* ¶ 17—in other words, actually drawing retirement benefits.

24.   Warren was not in pay status as of December 31, 1990 or January 1, 1991. *Id.* ¶ 19.   He began receiving his monthly pension benefits on July 1, 1995.   *Id.* ¶ 20. The amount of his monthly benefit was $250.53—the amount Gannett had told him he would be getting prior to his election of the deferred-payment option at the time of his retirement.   *Id.* ¶ 21.   His monthly benefit amount has not changed since July 1, 1995.   *Id.* ¶ 22.

25.   Warren was aware at the time he received his first monthly pension benefit on July 1, 1995 that it did not include the 1991 increase to which he believed he was entitled.   *Id.* ¶ 23.   In July 1997, during a conversation with Bonnie Campbell, Gannett's benefits coordinator, regarding a mistake in his health insurance, Warren mentioned that his monthly benefit did not include the 1991 increase despite his belief that he was entitled to it.   *Id.* ¶ 24.

26.   By letter from Campbell dated July 21, 1997, Gannett informed Warren that his request for an increase in benefits was denied because he was not in pay status as required by the terms of the GGRP92.   *Id.* ¶ 26.   By letter dated July 28, 1997 from Mahoney, Gannett's corporate benefits manager, Gannett reiterated to Warren that his request for an increase in his monthly pension benefit was denied be-

cause he was not in pay status as required by the terms of the GGRP92.   *Id.* ¶ 27.

27.   In or about November 1998 Blethen Maine Newspapers, Inc. succeeded to and assumed certain of Gannett's responsibilities under the GGRP84 and GGRP92. *Id.* ¶ 28.   The Blethen Maine Newspapers, Inc. Pension Plan ("BMNI Plan") is the successor defined-benefit plan to the GGRP84 and GGRP92.   *Id.*

28.   Blethen Maine Newspapers, Inc. is a corporation organized under the laws of the State of Washington authorized to do business in the State of Maine with offices at 390 Congress Street, Portland, Maine, and is the Plan Administrator of the BMNI Plan, with overall responsibility for its administration and operation.   *Id.* ¶ 29.

29.   The Gannett Board of Directors that authorized the pension-benefit upgrade on September 25, 1990 did not expressly limit, in writing or otherwise, the pension-benefit upgrade to eligible retirees in a pay status as of December 31, 1990. *Id.* ¶ 31.   Nor did it expressly authorize in writing the inclusion of the "in pay status" language in paragraph 4.08 of the GGRP92.   *Id.* ¶ 32.   Baker, drafter of the Board resolutions, was not at the time familiar with the precise "in pay status" language (which later was authored by Watson Wyatt).

30.   The "in pay status" language contained in paragraph 4.08 of the GGRP92 was not required to comply with the laws and regulations governing the plan.   *Id.* ¶ 35.

## II.   Conclusions of Law

1.   Prior to bringing this action, Warren exhausted his administrative remedies as provided under the relevant provisions of the GGRP84, GGRP92 and the BMNI Plan. *Id.* ¶ 33.

2. Warren's claims are not barred, in whole or in part, by applicable statutes of limitations. *Id.* ¶ 34.

█ 3. "[I]nformal or unauthorized modification of pension plans is impermissible under ERISA[.]" *Dall v. Chinet Co.,* 33 F.Supp.2d 26, 42 (D.Me.1998), *aff'd,* 201 F.3d 426 (1st Cir.1999) (citation and internal quotation marks omitted); *see also, e.g., Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 85, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) ("ERISA ... follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level.").

█ 4. In an ERISA case challenging the validity of a plan amendment, a plaintiff bears the burden of demonstrating not only the invalidity of the amendment but also, for purposes of entitlement to substantive relief pursuant to 29 U.S.C. § 1132(a), harm or prejudice flowing therefrom. *See, e.g., Chinet,* 33 F.Supp.2d at 45–47. Warren meets this burden.

5. In accordance with section 15.01 of the GGRP84, which was in effect at the time of the September 25, 1990 Board meeting, the Gannett Board alone was authorized to exclude "retirees not yet in pay status as of December 31, 1990" from the 1991 Increase.[7] Further, it could do so only "by resolution ... setting forth such modification or amendment[.]" *See* Stipulations ¶ 12.

6. Regardless whether Baker and/or DiMatteo explained the exclusion of the so-called "deferred vested" group to the Board,[8] nothing in the Resolution "sets forth" either the language ultimately incorporated into section 4.08 (excluding retirees not yet in pay status as of December 31, 1990) or any other language hinting that this group was to be excluded.[9]

7. Section 15.01 authorized the Board to delegate plan-amendment authority only with respect to modifications (i) required to comply with law or (ii) administrative in nature. The parties have stipulated that the 1991 increase was not required to comply with law; and, as defense counsel acknowledged during closing argument, a decision to exclude an entire class of beneficiaries from a slated increase cannot reasonably be described as "administrative" in nature.

8. Contemporaneous memoranda suggest that, whatever was said or explained at the Board and Outside Directors Committee meetings, those present did not come away with a monolithic understanding that retirees not in pay status as of December 31, 1990 were to be excluded. For example, the memorandum of Hooper who was present at both meetings—describes the benefits increase as applying to "all" retirees, consistent with past practice of affording such upgrades to "everyone currently in the plan." Plaintiff's Exh. 12. And, although Hawley's memorandum to "retirees" was not sent to Warren and referred to an increase in upcoming January checks, it (i) expressly mentioned exclusion of the PTU–66 but no other exclusion and (ii) described the 1991 Increase as "consistent with our past practice of increasing benefits from time to time to help counter the effects of inflation." Plaintiff's Exh. 3.

9. To the contrary, the Resolution on its face suggests that this group was to be included. In their trial brief, the Blethen Defendants argued that "if, as Mr. Warren suggests, the Gannett Board's September 25, 1990 resolution increasing pension benefits was meant to apply to all persons who were retirees in the common parlance, the parenthetical phrase '(as of December 31, 1990)' following 'for retired employees' would be superfluous." Blethen Defendants' Trial Brief ("Defendants' Brief") (Docket No. 32) at 7–8. However, during closing argument, counsel for the Blethen Defendants acknowledged that the phrase was not superfluous at the time the Board acted in September 1990 (and thus raises no facial ambiguity) inasmuch as the Board logically would have had to delineate a cutoff date (December 1990) by which persons would have to be "retired"—whether in pay status or not—to qualify for the benefits increase effective January 1, 1991. In the

7. For that reason, Warren meets his burden of demonstrating that the language "who is in pay status as of December 31, 1990," contained in section 4.08 of the GGRP as amended and restated (*i.e.*, the GGRP92) and carried forward into the BMNI Plan, was not adopted in accordance with Gannett's own plan-amendment procedures, as required by ERISA, and accordingly is invalid.

8. But for the unauthorized incorporation of this "in-pay status" language into section 4.08 of the GGRP92, Warren would have been considered eligible for, and would have begun receiving as of July 1, 1995, the 12 percent pension-benefit increase authorized for persons with participation dates prior to January 1, 1978. He therefore meets his burden of demonstrating harm or prejudice entitling him to substantive relief pursuant to 29 U.S.C. § 1132(a).

9. In light of the foregoing, judgment is entered in favor of Warren and against the Blethen Defendants as follows:

A. That Warren be, and he hereby is, awarded a 12 percent increase in his pension-benefit amount retroactive to July 1, 1995 (thereby affording him the benefit increase denied on the basis of the plan language that I today hold to have been invalid and unauthorized); and

 B. That Warren be, and he hereby is, awarded prejudgment interest computed in accordance with 28 U.S.C. § 1961(a) from the date of filing of the

instant action through the date of judgment.[10]

So ordered.

---

absence of the parenthetical "(as of December 31, 1990)," the cutoff date would have been September 25, 1990, the date on which the Resolution was adopted.

10. I do not here address Warren's request for attorney fees and costs, *see* Complaint at 14, the subject matter of which is covered in Local Rules 54.2 and 54.3. I further note that, although the Complaint seeks "injunctive relief," evidently in the form of an order

that the Blethen Defendants strike the "in pay status" language from section 4.08 of the GGRP84, *see* Complaint at 14, I am confident that the defendants will understand that, for purposes of Warren's entitlement to the increase he seeks (both retroactively and henceforth), section 4.08 of the GGRP84 is to be treated as though it did not contain the "in-pay status" language.